Douglas Nelson on behalf of the petitioner. In this case, the immigration judge erred as a matter of law and abused his discretion when he made the devastating finding that the respondent filed a frivolous application for asylum. In immigration law parlance, we know it as the death penalty of immigration because you can never receive any salvation from that finding if that decision is upheld. Even if you were to marry a U.S. citizen or have children here, or just to come back and visit for a funeral, you are not allowed to live in or visit the United States. In order to make that finding, the immigration judge must find that the petitioner deliberately fabricated the claim. But in this case, there was no aha or gotcha moment where the judge or the INS presented evidence proving that the application was false. Rather, the decision of the immigration judge was based upon inconsistencies, perceived inconsistencies, and assumptions by the judge. We don't think the judge's decision is supported by the record. We think that indeed the case should be remanded to a new judge and be given a fresh hearing. But the bulk of the judge's decision revolved around a vehicle accident, which is really not the claim of persecution. The claim of persecution was that the petitioner was tortured and beaten on account of his religion, on account of his ethnic minority status as a Chaldean and his political opinion. Ginsburg. Mr. Nelson, would you spell out for me where in the record there is a there, there? I'm having a little trouble finding it. And this is not on the frivolousness point. It's on just the basic point of how, where in the record is the link between, you know, his religion or political viewpoint and his being jailed? Because it looked to me as if he was jailed because he managed to get into an automobile accident with the wrong person. That is how the incident initially started. And immediately thereafter, the guards in the vehicles, the political guidance officer's entourage accused him of attempting to assassinate that political figure. And thereafter, throughout the torture and detention, the main question was whether, strike that, the focus was on his religion and whether he supported the beatings and the torture he received. So, by chance, he came across this accident. They blamed it on him, and his religion and his ethnicity became a factor thereafter. Now, your cheering, your cheering section is very brutal. I was going to say, some of the lawyers feel that way, too. Now, the judge, the bulk of the judge's decision was about the incident, the automobile accident, not about whether he was tortured or not. Because the reports of torture were consistent with country reports. It was internally consistent, the testimony was. It was plausible. But the judge was confused about the accident. Was the door opened or closed when they began firing upon the respondent? The respondent did give inconsistent answers. But let's not forget, this was a mind-jarring, high-speed accident. It was a glancing blow. The car spun around a lot. And I think it's unreasonable for the judge to expect the petitioner to remember every single detail of that accident. But there were other things that the immigration judge relied upon as well. For example, demeanor. For example, the allegation that he was going to be subjected to bad treatment in the military but he spent five years and was never sent to the front lines, such as his inability to relate accurately the military ranks, having allegedly spent five years in the military, and so forth. So what about all those other bases for the credibility determination? Is there some problem with those as well? Your Honor, regarding his military service, the judge is making the assumption or using personal conjecture to determine that this petitioner was well-versed or taught or trained by the Iraqi military. The record to me reflects that he was a grunt, he was discriminated against, he was persecuted because of his opposition to the Ba'ath Party. I doubt that this petitioner received the same training that a Muslim Arab member of the Ba'ath Party would receive. And so there is an assumption made by the judge that he should have been trained better or known more than he did. And also, regarding the recitation of the different ranks, it's confusing for anybody to go through them. Neither myself or government counsel have been able to outline those and put those in the brief and tell whether they are correct or not. Indeed, there's nowhere in the record a listing of what ranks are correct. And so I don't think that was a sufficient credibility determination. A private in the Army after five years, I mean, it's one thing to say, you know, after eight weeks, you haven't figured it out. But if he spent five years, that you wouldn't know what, who was above you, who gave you orders, and who gave them orders? Well, first, we don't know what was correct. What is the correct order? Well, that's the point, because his recitations were inconsistent. That was the very point that the immigration judge was making, isn't it? And it's equally plausible that the petitioner did not understand why was he being asked about the ranks of the military when his day in court was for testifying about his torture. So I think that's an equally plausible explanation. As to why the government didn't persecute him further when he was in the military, it's reminiscent of the GUI, the INS cases, G-U-I, wherein this court held that, well, the immigration court in the lower decision decided that if the government in that case had the authority to persecute you, they should have killed you before you got here. Well, that clearly doesn't fly, because then no petitioners would ever make it to the United States. Likewise, if the Iraqi government had followed through with its threats in the military, the petitioner wouldn't be here. He would have died before ever coming. Also in the record, it does state there are country reports from the U.S. Department of State which say that the application of the laws in Iraq are arbitrary, that arrests are not allowed. So we can't expect them to have a consistent application of the law against persons that they perceive to be political opponents. And we look for that, for the nexus to his testimony about what happened once he was in jail? Yes. Well, indeed, throughout his life, he complains of persecution. Well, yes, and one of the problems is that he was, you know, inconsistent about it in that he said, I was threatened by the Ba'ath Party that I'd be sent to the front lines if I didn't do whatever, if I didn't participate with them. But he never was in five years. So, you know, that's something else that the I.J. relied on. And so, you know, while I appreciate the fact that life must have been difficult, I'm just looking for the real nexus between what he says happened in prison and his religious or political beliefs. That incident by itself, his military experience, is insufficient in my opinion. And that is not the primary basis for him leaving the country and coming to the United States to apply for asylum. It is merely a full explanation of what had happened to him throughout his life. Maybe some of the threats were empty, but they certainly didn't terrorize this respondent or petitioner, strike that. Now, the immigration judge also denied indiscretion, and we believe this is an abuse of discretion, because the petitioner came to the United States border and applied for asylum. Rather than going to an American embassy or some other organization and waiting his turn to come to the United States. That holding is wrong, because Congress has implemented a system through which aliens come to the United States border, go through a cut-off interview, and are placed into immigration proceedings and given an asylum hearing. If all aliens were expected to wait in embassies abroad, then the system is useless, which was implemented by Congress. Also, the judge is again using personal conjecture and assumptions by stating that the petitioner should have known there was a line of people coming to the United States. That the petitioner should have known he could have applied abroad. The petitioner said that he was fearful in Greece of applying for asylum with either the Greek government or the American government, because he feared he would be arrested for sure. Ms. Franklin. Go for it. May it please the Court. My name is Erica Franklin, for the Respondent. The immigration judge's decision, which later became the agency's final determination, gave clearly two reasons for denying the petitioner's asylum application. These two reasons were independent and separate from each other. The first reason was because he determined that the petitioner did not establish his eligibility with credible testimony. And second, and separately, the immigration judge exercised his discretion to determine that this petitioner was not entitled to asylum based on his circumvention of orderly refugee procedures abroad. In the discretionary decision, the judge did not abuse his discretion. Rather, he did not jump to the instance of the petitioner coming to the U.S. border and applying for asylum. Rather, he looked at the full record. And he started with the petitioner's escape from the U.S. border. And he asked the smuggler to arrive in Turkey, a smuggler that he paid $2,000, and then stayed in Turkey for one month. I guess there's one thing. I mean, just as a practical matter, I don't quite get that. Because assuming that there was a genuine reason for getting out of Iraq, why wouldn't one do anything one could to get the heck out of there? Your Honor, the Attorney General agrees with you. However, what the immigration judge did was look at the whole circumstance. That was just the beginning. So he did not flee to Turkey and stay in Turkey or try to gain relief from Turkey. Rather, he again employed another smuggler to then move on to Greece, where he stayed for one and a half years. He lived in Greece. He had an apartment with his fiancée in Greece. They married in Greece for one and a half years. He was in Greece. But you're not relying on firm resettlement. No, Your Honor, we're not. And if you look back at the firm resettlement regulations, they suggest that fleeing through a series of other countries is recognized, is somehow acceptable. Because in those regulations, it says that these things demonstrate firm resettlement unless, and then there are a lot of them, is that you were fleeing through a whole bunch of other different countries before you got here and that that was all part of your escape. So why isn't that kind of an affirmative recognition that this sort of bumping from country to country until you finally can get here is not against the rules? Because here the immigration judge has told us that he exercised his discretion and he decided not just that it was the fleeing from country to country to country, but also that the petitioner did not seek and apply in any country for any type of refugee status from the United States or from the country which he was in. Where does it say that you have to do that in order to apply for asylum? There is not, or we cannot cite a specific regulation that requires a potential refugee to apply in another country. However, that is a factor. Doesn't that regulation, the other regulation, suggest that it would be inconsistent to have a regulation or a rule of the kind for which you're arguing? I'm sorry, you understand? Well, it just seems to me that your position in this case is inconsistent with the existing regulation on firm resettlement because it contains within it a recognition that people will be moving from place to place in order to get here and that that won't preclude them from an asylum claim here. Your Honor, let me clarify. I'm not proposing that a new rule be established or that the judge was basing his discretionary decision on some existing rule. This case does not involve resettlement. The judge's decision is not based upon resettlement. Rather, the judge is looking at the whole circumstance. He's looking at the incredible testimony and he's also looking, but mostly at, the failure of the petitioner to try to gain relief elsewhere. Again, the petitioner was in Greece for one and a half years. He did question other people. He was aware that there was a process that he could undergo in order to gain relief from either the country that he was in or from the United States. Rather, he chose not to. In fear to do so, he did not give any testimony to establish any fear, any basis for that fear. That was an alternate holding, right? The discretionary denial, yes, Your Honor. And then he even became more sophisticated in his travels from country to country because while in Greece he then hired a smuggler to give him a Danish passport with which he was able to travel to France and then finally upon entry into Mexico, he was basically found out. We have always held that the use of false papers other than a false U.S. passport would not be held against an individual because they have to employ all kinds of ruses to get themselves to the United States and we've just accepted that as the way it is. So I think the way he got here, it seems to me that's not really the issue. Okay. Well, there is an issue there that he did use a false passport. He did have a Danish passport. He didn't use a false U.S. passport. That's correct. He did not use a false U.S. passport and he actually did not try to enter the United States. He was trying to enter Mexico at the time. And again, what the immigration judge has done is use the discretion as an alternate basis to deny the asylum for this person to that relief. Additionally, and separately, the immigration judge determined that this petitioner was not credible. He did not establish eligibility with credible testimony. Would you point out to us exactly what he thought was incredible? Yes, Your Honor. The immigration judge, through his decision, there are several instances that he finds incredible or inconsistent. For example, and probably of the most importance, which we have not really focused on today, is his military service. This goes to the crux of the petitioner's complaint. The heart of his asylum application is that he was persecuted while in military service. And what the record indicates and the immigration judge points out is that, as we discussed, the petitioner was in the Army for a period of five years. Regardless of his position in the Army for that time, it was a five-year period. It's reasonable to expect someone who was in the military for five years to know the basics about the military. And one such basic is the rank of officers. Nevertheless, when a question... Well, is anybody... the I.J. wasn't suggesting that he was not in the military for five years. Actually, the immigration judge did suggest. He questioned whether he was even in the military. The immigration judge even further suggested that he was not sure of this petitioner's identity. But yes, in his opinion, he does indicate that he questioned his service in the military. And it's not an issue of which of the ranks was correct. The issue is that he gave four to five different renditions. If he did give a correct rendition, he wasn't... he was unable to identify that correct rendition himself. So the problem the immigration judge had with that testimony is that it was incoherent and that it was internally inconsistent. Additionally, as far as being persecuted in the military, he stated in the record on page 110 to 111 that he was sent to the front lines. He testified to that. And then later in his testimony, when questioned about that, he admitted that he was, in fact, not sent to the front lines, but that he was only threatened to be sent to the front lines. And then following up on that issue, the immigration judge learns that, yes, he was threatened to be sent to the front lines, but he never was sent to the front lines in his five years of military service. He was sent to some kind of a remote place, wasn't he? Yes, Your Honor, but he was never sent to the front lines. And that was his basis for arguing that he was persecuted, harassed in the military. Because presumably the front line was the dangerous place where he would be likely to be killed. Correct, Your Honor. I have 50 seconds left. If I could briefly address the frivolous issue. This immigration judge determined, based on watching the demeanor of the petitioner over several hours of testimony, indeed several days, and listening to the answers and confronting inconsistent answers at that point, tried to determine, well, he did determine that the petitioner was not only incredible, but that his application was frivolous. Counsel, in reaching that determination of frivolousness, did the immigrant, and I should remember this myself, but I don't, did the immigration judge rely on any specific inconsistencies to reach a frivolousness determination that the petitioner did not have a chance to explain sometime during the hearing? In other words, did he have a chance to explain about the military ranks, to explain about the front lines, and so on and so forth? My time has expired. May I continue and answer your question? I'd appreciate it. The immigration judge gave the petitioner a time to explain each inconsistent statement. With regard to the frivolous finding, the immigration does point to two specific instances, and that is the accident, and then the incarceration that followed the car accident. But again, he was looking at the entire record, but these are the two that he specifically pointed out with regard to the car accident. And he had a chance to explain about those? Yes, Your Honor. With regard to the car accident, we've seen in the petitioner's brief counsel's version of why a petitioner testified this or that way. However, the question here, the standard, is substantial evidence. So it's not a question of whether another fact finder could find differently, but whether substantial evidence supports this immigration judge's decision, or whether the record compels some alternate decision. Thank you very much. Mr. Nelson. I have some quick points to make. First, with regard to the military service, I'll admit that is not the crux of this claim. The crux of this claim is the torture he received thereafter. It is background material to show how Chaldean Catholics are treated in a country when the opposers do not support the Ba'ath Party. Second, and besides, that happened in 1994, many years ago. It was not the event that compelled him to leave. Second, regarding the demeanor, the immigration judge never described the respondent's demeanor. He merely said, the respondent made some vague, inconsistent statements. I'm not going to address those now. I'm going to concentrate on the accident. I'm going to concentrate on other areas. So there was never a description of the demeanor that you can rely upon in the record. Finally, where do we go from here? I think, clearly, the frivolous finding cannot be supported by the record. Second, the inconsistencies contained in the record were minor and never addressed the heart of the claim that he was tortured, the last event which compelled his departure. I think the case should be sent to the board for an appropriate decision or, in the alternative, returned for an entire rehearing. Admittedly, the record is confusing and I think the case should start from scratch as an alternative. Thank you. Counsel, thank you for your argument. The matter just argued will be submitted and the Court will stand adjourned.
judges: B. Fletcher, Rymer, Graber